Filed 2/27/23  P. v. Diaz CA4/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076440 |
| v. | (Super.Ct.No. INF1302087) |
| LUIS RAUL DIAZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge.  Reversed.

Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charlese C. Ragland, Assistant Attorney Generals, Arlene A. Sevidal, James M. Toohey, Lynne G. McGinnis and Susan Elizabeth Miller, Deputy Attorney Generals, for Plaintiff and Respondent.

Defendant and appellant Luis Raul Diaz appeals from a trial court's order denying defendant's petition for relief under Penal Code[1] section 1170.95. For the reasons set forth *post*, we find that defendant made a prima facie showing that he falls within the provisions of section 1172.6, and is therefore entitled to a remand for further proceedings on his petition.

## FACTUAL AND PROCEDURAL HISTORY

### A. PROCEDURAL HISTORY

In 2014, a jury convicted defendant of first degree murder and found true the special circumstances that the murder occurred during the commission of a kidnapping under sections 187 and 190.2, subdivision (a)(17)(B). The trial court found true that defendant had a prior serious felony conviction under § 667, subdivision (a). Thereafter, the trial court sentenced defendant to life without the possibility of parole for the murder, plus five years for the prior serious felony conviction.

On January 22, 2016, after defendant appealed, we affirmed the judgment in *People v. Diaz* [unpub. opn. 2016] E062324.

On September 21, 2020, defendant filed a petition for resentencing under section 1170.95. The trial court appointed counsel to represent defendant. The People filed opposition. On January 8, 2021, the trial court summarily denied defendant's petition.

---

[1] All further statutory references are to the Penal Code unless otherwise specified. In addition, section 1170.95 was renumbered effective June 30, 2022, to section 1172.6. (Stats. 2022, c. 58 (A.B. 200), § 100, eff. June 30, 2022.) We will refer to the new numbering and current version in this opinion.

On January 14, 2021, defendant filed a timely notice of appeal from the denial of his section 1170.95 petition. On February 4, 2021, defendant filed a second notice of appeal. In an unpublished opinion filed on October 1, 2021, we affirmed the denial of the petition based on the state of the law at that time.

Defendant filed a petition for review, which was granted. On October 26, 2022, the California Supreme Court transferred the matter back to this court with instructions to vacate our previous decision and reconsider the cause in light of *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*). In *Strong,* the California Supreme Court found that felony murder special-circumstance findings issued by a jury before the decisions of *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which clarified the terms "major participant" and "reckless indifference to human life" in the special-circumstance statute, do not preclude a defendant from making out a prima facie case for resentencing of a felony-murder conviction, even if the trial evidence would have been sufficient to support the findings under *Banks* and *Clark*.

On October 27, 2022, we vacated our previous opinion and requested that defendant and the People file supplemental briefs. Defendant did not file a supplemental brief. In its supplemental brief, the People concede that "[b]ased on *Strong*, the matter should be reversed and remanded." For the reasons set forth post, we will remand the matter to the trial court for further proceedings.

B.    FACTUAL HISTORY[2]

1.    *"DISAPPEARANCE OF THE VICTIM AND DISCOVERY OF HIS*

*SKELETAL REMAINS*

"Destiny Ayala was the victim's sister.  She last saw the victim in July 2011.  She exchanged text messages with him in August 2011.  She became concerned in early September when she had not heard from him.  She went to his house in Palm Springs but he was not there.  She filed a missing person's report with the Palm Springs Police Department.

"On December 19, 2011, a Riverside County Sheriff's deputy responded to a call that skeletal remains had been found in the area of Sky Valley.  In order to access the area, the deputy had to use a dirt road.  The area where the skeletal remains were found was remote, open desert.  The remains were scattered, most likely due to animal activity.  There were two burn areas near the remains.  A melted belt buckle, a fired projectile, a live round of ammunition, and a burned T-shirt were found by the remains.

"Sergeant Deborah Gray of the Riverside County Coroner's Office was a forensic anthropologist trained to examine skeletal remains.  She was called to the Sky Valley area to examine the skeletal remains.  She determined that all the bones found belonged to one person.  The person had been deceased between two weeks and six months. The person was likely male, White or Hispanic, and between 20 to 23 years old.

---

[2]  The facts are taken from the unpublished opinion in case No. E062324.

4

"Riverside County Sheriff's Investigator Martin Alfaro was the lead investigator on the case. Based on DNA identification and dental comparison, it was determined the remains belonged to the victim. An autopsy was performed on the victim's remains. The victim had a semicircular defect in his skull, which was likely the result of a bullet wound."

2. "*ASHLEY PRIETO'S TESTIMONY*

"Ashley Prieto was living in Morongo during the summer of 2011. She knew De Los Santos from high school. After they graduated, Prieto started buying drugs from De Los Santos. She had known the victim since 2010; she had purchased drugs from him. She also knew defendant because he dated her friend, [C.A.].

"In August 2011, Prieto received a telephone call from the victim. He told her that he was in a car with De Los Santos and defendant on the way to Las Vegas. She was concerned because defendant and De Los Santos were heavily involved in drug sales and the victim was not as heavily involved. The victim went missing.

"Several months later, in approximately October, Prieto was in Palm Springs with De Los Santos. She and De Los Santos were smoking marijuana. She asked him what had happened to the victim. De Los Santos told her that he believed the victim had broken into his house and tied his girlfriend up during a robbery. As a result, De Los Santos told Prieto that he took the victim out to the desert and shot him in the head. De Los Santos told her that the victim had confessed to being involved in the robbery of De Los Santos's girlfriend so he deserved to be killed. Prieto felt that De Los Santos was proud to have killed the victim.

5

"On December 28, 2011, Investigator Alfaro interviewed Prieto. Prieto told him that De Los Santos had told her he shot the victim in the head. The information that the victim had been shot in the head had not been released to the public. Prieto would not have known the information from another source."

### 3. "*WALDO BARKER'S TESTIMONY*

"Waldo Barker[3] was arrested during an automobile theft investigation; he told the arresting officer that he knew about a murder involving defendant and De Los Santos. Investigator Alfaro interviewed him. Barker was made no promises of leniency in the automobile theft case.[4]

"Barker met De Los Santos in 2011. Barker was a mechanic and he worked on De Los Santos's car. Barker and De Los Santos used drugs together. Barker had met defendant through De Los Santos.

"Sometime in August 2011, around 4:00 a.m., Barker went to a condominium in Cathedral City, where De Los Santos lived, to eat and get 'high.' Defendant was with De Los Santos. While Barker was at the house, the victim called De Los Santos looking for heroin. Around 5:30 a.m., De Los Santos left the house to get the heroin and Barker went home. Barker was unsure if defendant also went home.

---

[3] "Barker was unavailable for trial because he invoked his Fifth Amendment right not to testify; his preliminary hearing testimony was read to the jury."

[4] "Barker had a 2004 conviction for burglary, a conviction for automobile theft, and a conviction for possession of methamphetamine."

"De Los Santos called Barker around 7:30 a.m. and told him to come back to the condominium. When Barker got to the condominium, he saw that the front door jamb had been broken and the place was ransacked. De Los Santos was upset. He had a handgun in his waistband. De Los Santos asked Barker where he had been since he had left the house. De Los Santos told Barker that he had been robbed. Barker advised De Los Santos that he had been working; De Los Santos told him that he believed him. He said he knew who had done it and that he already had him.

"De Los Santos took Barker to his bedroom. The room was ransacked. In a nearby bathroom, he saw the victim; the victim had a split lip and a black eye. The victim repeatedly told De Los Santos that he had not committed the burglary. De Los Santos had Barker sit with the victim while he went to do something. The victim had blood on his shirt.

"De Los Santos returned and told the victim to put on a hooded sweatshirt, a hat and sunglasses. He told the victim that he was going to take him home. The victim continued to plead with De Los Santos, advising him he had not committed the burglary. De Los Santos told Barker to watch the house for him because the front door was broken.

"De Los Santos walked the victim out of the house while holding the handgun. De Los Santos told the victim not to do anything stupid and not be loud, and 'everything will be cool.' De Los Santos gave Barker a look that Barker interpreted 'like a wink,' that he was not going to take the victim home.

"De Los Santos and the victim left in a green sedan that was driven by defendant. Defendant had been outside waiting in the car; De Los Santos and the victim got in the backseat.

"Barker observed spots of blood on the hallway floor. De Los Santos called Barker and asked him to try to clean up the blood. Barker tried to clean up the blood but was unsuccessful. Barker went home around 8:45 a.m. De Los Santos was still not home.

"Barker saw De Los Santos and defendant several days later. Barker told defendant that the victim's girlfriend was worried that she had not heard from the victim. Defendant told Barker that they had driven the victim out to the desert in Sky Valley. The victim kept asking De Los Santos not to hurt him. Defendant claimed he tried to convince De Los Santos not to hurt the victim, and to convince the victim to tell the truth about the burglary. Defendant claimed that De Los Santos 'snapped.' Defendant walked away and De Los Santos shot the victim. De Los Santos told Barker that the victim had 'told more truth than he should have' and had admitted his involvement in the burglary. De Los Santos admitted to Barker that he had lost it and shot the victim. They left the victim's body tied to a post.

"Barker directed Investigator Alfaro to the condominium where De Los Santos had lived. De Los Santos's no longer lived in the condominium. The front door jamb showed signs of damage. There were bleach stains on the carpet. Chemical tests were done on some of the walls and carpet, and were presumptive for blood. During a search

8

of De Los Santos's car, police found shotgun shells.  Police also found a loaded rifle, and .40-caliber ammunition in De Los Santos's new apartment."

4. "*[C.A.]'S TESTIMONY*

"[C.A.] was defendant's girlfriend in 2010 and 2011.  She and defendant used drugs when they were dating, including heroin and methamphetamine.  [C.A.] and defendant moved into an apartment together in Palm Springs.  The victim would come to the apartment approximately once each week.  They would all do drugs together.  [C.A.] met De Los Santos in high school; he was her drug supplier.  In 2011, defendant drove several different cars, including his mother's Toyota sedan.  At the time of the victim's murder, defendant had been working with De Los Santos selling drugs for him.

"The last time [C.A.] saw the victim was in August 2011; she became concerned when she had not heard from him in a week.  [C.A.] asked defendant whether he had talked to the victim recently.  Defendant told her he had not talked to the victim and that she was not to mention the victim any more.  She thought this was strange because they had been friends.  [C.A.] heard rumors about what had happened to the victim.  [C.A.] asked defendant if he had killed the victim, and he claimed he had nothing to do with it.  In a pretrial interview, [C.A.] had claimed that when she asked defendant about the victim, he told her to 'stay the fuck out' of the disappearance and was adamant that she not mention the victim's name.

"During the investigation, Detective Alfaro discovered that defendant was in prison.  No search of defendant's home could be made because of his incarceration.  The parties stipulated that defendant pleaded guilty in Riverside County on September 30,

9

2011, to one felony count of possession for sale of a controlled substance.  He was sentenced to two years eight months in prison."

## DISCUSSION

In light of the decision in *Strong*, *supra*, 13 Cal.5th, remand to the trial court for further proceedings is necessary.

SB 1437 became effective January 1, 2019.  "[SB 1437] modified California's felony murder rule and natural and probable consequences doctrine to ensure murder liability is not imposed on someone unless they were the actual killer, acted with the intent to kill, or acted as a major participant in the underlying felony and with reckless indifference to human life."  (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 220.)  As relevant here, SB 1437 added section 189, subdivision (e), which provides, "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."  (§ 189, subd. (e).)  Section 190.2, subdivision (d) provides, "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some

10

person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

SB 1437 also created a process through which convicted persons can seek resentencing if they could no longer be convicted under the reformed homicide law. (§ 1172.6, subd. (a).)  Section 1172.6, subdivision (a), provides in part, "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts."  Section 1172.6, subdivision (c), provides, "Within 60 days after service of a petition . . . , the prosecutor shall file and serve a response.  The petitioner may file and serve a reply within 30 days after the prosecutor's response is served.  These deadlines shall be extended for good cause.  After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief.  If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause.  If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."  If the petitioner makes a prima facie showing he is eligible for relief under section 1172.6, the

11

court shall hold an evidentiary hearing. (§ 1172.6, subds. (c) & (d)(1).) At this hearing, either party may present new evidence and the prosecution bears the burden of proving the petitioner could still be convicted beyond a reasonable doubt. (§ 1172.6, subd. (d)(3).)

In *Strong*, the California Supreme Court resolved a split of the Courts of Appeal as to whether a special circumstance finding reached prior to *Banks* and *Clark* precluded relief under section 1172.6. *Banks* and *Clark* "substantially clarified the law" regarding what it means to be a major participant who acts with reckless indifference to human life for the purposes of the special circumstance statute. (*Strong*, *supra*, 13 Cal.5th at pp. 706-707, 721.) The *Strong* court concluded that where a defendant's "case was tried before both *Banks* and *Clark*, the special circumstance findings do not preclude him [or her] from making out a prima facie case for resentencing under section 1172.6." (*Strong*, at p. 721.) A court "err[s] in concluding otherwise." (*Ibid.*)

In this case, the trial court summarily denied defendant's petition for resentencing based on the felony-murder special circumstance finding made by the jury. However, the jury finding predated *Banks* and *Clark*. Hence, the special circumstance finding did not preclude defendant from "making out a prima facie case for resentencing under section 1172.6." (*Strong*, *supra*, 13 Cal.5th at p. 721.) Therefore, we agree with the People that "[s]ince the felony-murder special circumstance finding in appellant's case predated *Banks* and *Clark*, that finding does not render appellant categorically ineligible for resentencing under Penal Code section 1172.6." The trial court erred by summarily denying the petition relying on the special circumstance finding.

12

Accordingly, we must remand the matter for the trial court to consider defendant's petition in light of *Strong* as nothing in the record demonstrates that defendant is ineligible for relief as a matter of law. The trial court shall give defendant's counsel an opportunity to provide briefing, determine whether defendant has made out a prima facie case for relief and, to the extent necessary, issue an order to show cause and conduct an evidentiary hearing. (§ 1172.6, subds. (c), (d)(1) & (3).)

## DISPOSITION

The trial court's order denying the petition is reversed and the matter is remanded for further proceedings pursuant to section 1172.6, as set forth in this opinion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

SLOUGH
J.

RAPHAEL
J.

13